**In re Lola Jean Fawbush DILLON, Debtor.**

**Bankruptcy No. 397-09284-AT-7.**

United States Bankruptcy Court, M.D. Tennessee.

April 15, 1998.

Farris, Warfield & Kanaday, PLC, Robert C. Goodrich, Jr., Nashville, TN, for Chapter 7 Trustee.

Andy Tolbird, Nashville, TN, for debtor.

### MEMORANDUM

ALETA ARTHUR TRAUGER,
Bankruptcy Judge.

The court has before it the Chapter 7 Trustee's objection to the debtor's exemption of her right to royalties on songs written prepetition. The debtor argues that this right need not be exempted because it is not property of the estate. The debtor also asserts that the royalty rights are burdensome to the estate and are of inconsequential value and benefit to the estate. Therefore, argues the debtor, the Trustee should be ordered to abandon the estate's interest in them pursuant to 11 U.S.C. § 554(b).

The court finds that the debtor's right to songwriter royalties constitutes property of the estate. The debtor has properly exempted $4,000 of this interest. She, however, has not shown that the estate's interest in these rights is inconsequential or burdensome. The court, therefore, will permit the Trustee to market the rights for sixty days following the entry of the Order filed herewith. Within ten days after the marketing period, the Trustee shall file with the court a status report that includes a summary of his marketing efforts and the outcome of those efforts. If the Trustee is unable to successfully market the rights and has no prospect of negotiating a profitable sale, the court will reset this matter for hearing. At that hearing, the court will reconsider whether the Trustee should be ordered to abandon the estate's interest in the rights pursuant to § 554(b).

### I

The debtor commenced this case under Chapter 7 on September 29, 1997. Her Schedule C ("Property Claimed as Exempt") filed with the petition lists a $50 clothing exemption and a $1,000 personal property exemption for the pro rata portion of her 1997 tax refund. The songwriter royalty rights are not listed in the schedules. A meeting of creditors was held November 3,

1997. The debtor allegedly testified there that she wanted to exempt all her personal property, which included an interest in songs she wrote prior to filing her bankruptcy petition.

The Chapter 7 Trustee objected to the debtor's exemptions on December 2, 1997. The debtor responded on December 15, 1997. On that date, the debtor also amended her schedules to include her "songwriter's share of songs" as personal property and to claim a $4,000 personal property exemption in that interest pursuant to TENN.CODE ANN. § 26–2–102 (Michie 1980). The debtor did not assign a value to her "songwriter's share." Instead, she listed the value as "unknown."

The debtor has written several hundred songs. The copyrights to these songs are owned by one of three publishing companies, Sony, Polygram, and Coal Miner's Music. The debtor holds only a royalty contract right in these songs,[1] subject to a publisher's right to recoup previous advances made to the debtor.[2] Sony and Polygram have never recorded any of the debtor's songs and have never owed or paid royalties to the debtor. All royalties received by the debtor have been paid by Coal Miner's Music, for which the debtor testified she is an "exclusive writer."[3] It is these royalty rights that are at issue here. The parties stipulate that the debtor has historically received annual royalties from Coal Miner's Music of approximately $5,000.[4]

The debtor does not perform her songs for money. Instead her songs are performed by others. Some of the debtor's songs have been recorded by well-known country music singers. Some were released as singles and obtained top-ten positions on the music charts during the middle to late 1970s and early 1980s. The debtor testified that it was possible, but not probable, that any one of her songs could be recorded or re-recorded, become a "huge seller," and "make millions." She, however, has not had a song recorded in seven to eight years and no one has re-recorded any of her songs.

A hearing on the Trustee's objection was held January 20, 1998. Briefs were filed after the hearing. The debtor argued at the hearing and in her brief that the royalty rights are not property of the estate and, therefore, need not be exempted. The debtor also asserted that the royalty rights are inconsequential and burdensome to the estate and, therefore, the Trustee should be ordered to abandon the estate's interest in them pursuant to 11 U.S.C. § 554(b). The Trustee disagrees. He argues that to the extent the value of the rights exceeds $4,000 (the exemption amount),[5] he is entitled to use, sell, or lease the rights pursuant to 11 U.S.C. § 363.

The issues to be resolved here are these:

1. Whether the royalty rights constitute property of the estate pursuant to 11 U.S.C. § 541.

---

**1.** This contract right entitles the debtor to two types of royalties: mechanical royalties and performance royalties. Mechanical royalties are paid upon the sale of a recording that contains a song written by the debtor. Performance royalties are paid when one of the debtor's songs is performed publicly. These public performances include "radio airplay."

Mr. Thompson, the debtor's witness, testified that performing rights agencies prohibit, by contract, the sale of a songwriter's right to performance royalties. No contract containing such a restriction was introduced into evidence. The court makes no finding as to whether the sale of the debtor's right to performance royalties is prohibited by an anti-assignment clause.

**2.** The parties have not addressed whether there is a recoupment issue here. *See Waldschmidt v. CBS, Inc.*, 14 B.R. 309, 313–14 (M.D.Tenn.1981). There is evidence that Coal Miner's Music paid

advances to the debtor. It, however, was not a party to this matter. The court, therefore, will not rule on whether it is entitled to any recoupment.

**3.** The debtor testified that her written agreement with Coal Miner's Music has expired. Mr. Thompson, the debtor's witness, testified that the contract with Coal Miner's Music evidences that the debtor was an exclusive writer from 1974 through 1979.

**4.** From 1990 through 1996, the debtor's royalty income has ranged between a high of $13,018.42 in 1994 and a low of $1,942.67 in 1991. (Ex. 3.)

**5.** The Trustee conceded at the January 20, 1998 hearing that the debtor is entitled to exempt $4,000 of the rights. He argues, however, that she is not entitled to exempt them entirely from the bankruptcy estate.

2. Whether the royalty rights should be abandoned pursuant to § 554(b).

## II

### Property of the Estate

The U.S. District Court for the Middle District of Tennessee, in *Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (M.D.Tenn.1981), held that royalties derived from postpetition record sales were property of the estate. In that case, George Jones and CBS had executed a recording contract. Pursuant to the contract, Mr. Jones was required to make master recordings and, thereafter, was entitled to receive royalties from the sale of certain records. The master recordings were made prepetition and, therefore, Mr. Jones's royalty rights accrued prepetition. "The simple fact that Mr. Jones could not actually collect the royalties until some time after the date of his bankruptcy petition" did not prevent his rights from being considered property of the estate. *Id.* at 311.

■ The court will apply the *Segal* test, as set forth in *CBS, Inc.*[6] That test is "whether the bankrupt's claim to the asset is 'sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as "property" [of the estate].'" *CBS, Inc.*, 14 B.R. at 312 (quoting *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428, 432 (1966)). This is a balancing test. *Id.* The "degree of relation between the asset and the 'prebankruptcy past'" must be weighed "against the potential effect that placing the asset in the estate would have on the bankrupt's ability to make an 'unencumbered fresh start' after bankruptcy." *Id.*

■ Ms. Dillon's royalty rights are rooted in the "prebankruptcy past." The royalties are and will be paid on songs she wrote prepetition. All the work required by Ms. Dillon to earn the royalties occurred prepetition. Her contract right to the royalties, therefore, accrued prepetition. The only relationship the royalties have to her postpetition future is that she will continue to collect them after the filing of her petition. Under the *Segal* test, this "simple fact" will not prevent her royalty rights from being considered property of the estate. *CBS, Inc.*, 14 B.R. at 311; *see Andrews v. Riggs Nat'l Bank (In re Andrews)*, 80 F.3d 906, 910–11 (4th Cir.1996) (holding that postpetition payments under noncompetition agreement were property of the estate because they were "plainly rooted in, and grew out of, [debtor's] prepetition activities").

The royalty rights are not entangled with Ms. Dillon's ability to make an unencumbered fresh start. She may work postpetition to earn wages and collect royalties on songs written postpetition. Such postpetition earnings will not be property of the Chapter 7 estate. *See* 11 U.S.C. § 541(a)(6). In addition, the debtor may receive disability payments in the future that can be used to support herself.[7] Despite this, she argues that the royalties are her only means to accumulate "new wealth" and that she will be unable to support herself if the rights are included as property of the estate. The royalty rights, however, are not "new wealth" earned postpetition. Instead, the rights accrued prepetition and, therefore, 11 U.S.C. § 541 mandates that they be included as property of the estate. *See Chappel v. Proctor (In re Chappel)*, 189 B.R. 489, 493 (9th Cir. BAP 1995) (rejecting debtor's argument that *Segal* supports "that Congress intended to limit the scope of § 541 to ensure that certain interests are retained by the debtor to facilitate a fresh start").

---

6. In *CBS, Inc.*, Mr. Jones commenced his bankruptcy case prior to the effective date of the Code. Section 70(a)(5) of the Bankruptcy Act, therefore, was applicable. That section defined property of the estate to include "property ... which prior to the filing of the petition ... could by any means have [been] transferred." Under the Bankruptcy Act, the court in *CBS, Inc.* applied the *Segal* test. *CBS, Inc.*, 14 B.R. at 312. Since enactment of the Code, courts have continued to apply the *Segal* test under 11 U.S.C.

§ 541. *See, e.g., Andrews v. Riggs Nat'l Bank (In re Andrews)*, 80 F.3d 906, 909–10 & nn. 5, 9 (4th Cir.1996); *Chappel v. Proctor (In re Chappel)*, 189 B.R. 489, 493–94 (9th Cir. BAP 1995).

7. The debtor, who is 50, suffered a gun shot wound eight years ago. Her application for disability was denied. She is appealing that decision.

The court holds that the property of this Chapter 7 estate includes Ms. Dillon's right to royalties for songs she wrote prepetition.

## III

## Abandonment

The Chapter 7 Trustee seeks to sell the royalty rights. He asserts that, at a minimum, the rights are worth $5,000, but are more likely worth some multiple times $5,000. The Trustee, based on his discussions with other bankruptcy trustees, alleges that there is a market for these royalty rights. People in the entertainment business buy royalty rights as streams of income on a discounted cash flow basis. The Trustee stated that if allowed to sell the royalty rights, he plans to contact those individuals and possibly advertise the rights in one of the music industry periodicals. The Trustee conceded that he is unable to estimate what price he might be able to receive for the royalty rights.

■ The debtor argues that the court should order the Trustee to abandon the property pursuant to § 554(b) because it is burdensome to the estate and is of inconsequential value and benefit to the estate. The party seeking abandonment has the burden of proof under § 554(b). *See Smoker v. Hill & Assocs., Inc.*, 204 B.R. 966, 975 (N.D.Ind. 1997) ("[A] party seeking ... abandonment must present a *prima facie* case that the property is either burdensome to the estate or of inconsequential value or benefit to the

estate."); *In re Siegel*, 204 B.R. 6, 8 (Bankr. W.D.N.Y.1996).

■ The debtor's evidence consists entirely of the testimony of Walter Robert Thompson.[8] Mr. Thompson testified that there is not a third-party market[9] for the purchase of songwriter royalty rights. He, however, did not know whether Coal Miner's Music would purchase the debtor's royalty rights from the Trustee.[10] Mr. Thompson was not asked to value the royalty rights. He did testify that there is no formula for valuing such rights and he knew of no instance "where any writer royalties were sold based on any kind of a multiple formula because the future income stream is totally speculative." He and the Trustee, however, agree that the best way to value anything is based on what price a willing buyer would pay a willing seller in the open market.

Mr. Thompson also discussed the debtor's previous sale of certain royalty rights to Tree Publishing Company[11] by a contract executed on June 12, 1995. Tree owns the copyrights to numerous songs written by the debtor. Pursuant to the contract, the debtor sold her mechanical royalty rights in those songs to Tree for $3,000.[12] Mr. Thompson testified that the "$3,000 [sale price] for the list of songs involved indicates ... more a situation of perhaps [Tree] doing a favor for Ms. Dillon rather than establishing any kind of economic value" for the songs. The prior sale to Tree, therefore, provides little evidence of the value of the royalty rights at issue here.

The Trustee's witness, Stephen Miller,[13] testified that the Trustee might be able to

8. Mr. Thompson is an attorney admitted to practice in Tennessee and Colorado. He was president of SESAC in the mid 1980s and has worked in the music business since 1948. He is presently on the faculty of the Owen Graduate School of Management, does some consulting work, and represents "a very few clients" in the music industry.

9. A third-party market includes a third party purchasing a writer's share of a song. This is distinguished from a publishing company that holds the copyright to a song purchasing the writer's share in that song directly from the songwriter.

10. Mr. Thompson, if he were attorney for Coal Miner's Music, would advise it not to make such a purchase because of its long-standing relation-

ship with the debtor and its fiduciary relationship with the songwriter. Mr. Thompson, however, did not render an opinion on whether Coal Miner's Music's purchase of the debtor's royalty rights from the Trustee would somehow breach a fiduciary duty it might owe to the debtor.

11. The parties also referred to this entity as "Sony Tree."

12. Exhibit A to the contract includes the list of songs involved in this transaction. That exhibit is not attached to the copy of the contract introduced into evidence as Exhibit 1.

13. Mr. Miller is an attorney licensed to practice law in Tennessee since 1978. He has practiced entertainment law for the past ten years. Prior to that, he practiced bankruptcy law.

sell the royalty rights because "some significant cuts" are involved. He, however, could not estimate a probable selling price.[14] Mr. Miller also testified that the most likely purchaser is the publisher, Coal Miner's Music, but it may decline to make the purchase because of its close relationship with the debtor.[15] While the 1995 sale of royalty rights to Tree evidences an ability to sell the rights at issue here, Mr. Miller recognized that Nashville publishers, historically, have had a predisposition against purchasing songwriter shares. In Mr. Miller's opinion, however, this "long-standing tradition" is changing as "the homegrown companies are acquired by multinational companies" and, therefore, there is now some possibility of selling songwriter shares in the music industry. In fact, Mr. Miller indicated that, in certain situations, a potential licensee might find it economically attractive to acquire the writer's share in songs it wants to record. The Trustee, however, has not marketed the royalty rights to determine whether any potential buyer exists or whether a profitable sale price can be obtained.

The evidence does not support that the royalty rights are inconsequential or burdensome to the estate. The parties have been unable to provide any estimate of a potential sale price. There is testimony that the rights are marketable. The court, therefore, will not require the Trustee to abandon a potentially valuable asset until he has had an opportunity to market that asset and ascertain whether it has value to the estate and the debtor's creditors. Any resulting delay in the administration of the estate caused by the Trustee's marketing efforts will not compromise the debtor's fresh start, especially when balanced against the potential recovery that might be obtained for creditors. *See Siegel*, 204 B.R. at 9.

The Trustee will be given sixty days from the entry of the Order filed herewith to market the royalty rights. *See Carey v. Pauline (In re Pauline)*, 119 B.R. 727, 728 (9th Cir. BAP 1990) (affirming bankruptcy court's decision to order property abandoned unless trustee, in sixty days, found "a buyer who would be willing to buy the [asset] at a price sufficient to cover all of the liens … plus the allowed amount of the Debtor's … exemption"). Within ten days after the marketing period, the Trustee shall file with the court a status report that includes a summary of his marketing efforts and the outcome of those efforts. If the Trustee is unable to successfully market the rights and has no prospect of negotiating a profitable sale, the court will reset this matter for hearing. At that hearing, the court will reconsider whether the Trustee should be ordered to abandon the estate's interest in the rights pursuant to § 554(b).

---

14. In Mr. Miller's opinion, the royalty income stream primarily relates to "older catalog cuts" that are generating a "fairly consistent stream of mechanical income because they are some classic Loretta Lynn cuts." Little, if any, performance royalties are being paid. Most of the recordings have a "not spectacular, but consistent after life" through overseas and catalog sales. The songwriter royalty rights, therefore, are "worth some money" according to Mr. Miller and, at a minimum, they are worth at least $5,000.

15. Coal Miner's Music is controlled by Loretta Lynn or her family. The debtor testified that she lives with Ms. Lynn.